**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**COVINGTON**

**CIVIL ACTION NO. 04-207-JBC**
**CRIMINAL ACTION NO. 99-33-JBC**

**UNITED STATES OF AMERICA,**                                                    **PLAINTIFF,**

**V.**                              **MEMORANDUM OPINION AND ORDER**

**TERRY WAYNE COPE,**                                                    **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \* \***

This matter is before the court on defendant Terry Wayne Cope's motion to vacate his sentence pursuant 28 U.S.C. § 2255 (DE 241) and his motion for a new trial and to vacate, set aside, and correct his sentence pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure (DE 242). The court, having reviewed the record and being otherwise advised, will deny these motions.

According to the court's review of the electronic docket, three additional motions also appear to be pending before the court: first, the government's motion to strike the defendant's pro se motion for discovery (DE 306); second, the defendant's pro se motion for the court to take judicial notice of certain exhibits (DE 309); and third, the defendant's motion for an extension of time to file a reply to the government's proposed findings of fact and conclusions of law (DE 325).

As the court noted in its order of April 4, 2006 (DE 313), a defendant may allow counsel to act on his behalf, or he may proceed pro se; however, there is no right to hybrid representation.  When, as here, a defendant is represented by

counsel, the court need not consider the defendant's previous pro se filings. *E.g.*, *United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987).  Therefore, the court will grant the government's motion to strike the defendant's pro se motion for discovery (DE 306), and the court will also deny and strike pro se motion for the court to take judicial notice of certain exhibits (DE 309).  Finally, the court will grant the defendant's motion for an extension of time to file a reply to the government's proposed findings of fact and conclusions of law (DE 325).  The court has considered his reply (DE 326), which was filed on November 20, 2006, in deciding the pending motions.

The court will now address the defendant's substantive motions.

## I.    BACKGROUND

On August 18, 1999, Terry Cope ("Terry"), and his brother, Randall Cope ("Randall"), were indicted on twelve charges, including charges that they conspired to murder Sarah Jackson, Elizabeth and Ronald Nimmo, and former Assistant United States Attorney ("AUSA") David Bunning, as well as charges that Terry, aided and abetted by Randall, attempted to murder Sarah Jackson in retaliation for her testimony at a previous official proceeding.[1]  Sarah Jackson is Randall's former fiancée, and Elizabeth Nimmo, who is married to Ronald Nimmo, is Terry's ex-wife.

---

[1]  More specifically, Count Two of the indictment "charged that Terry attempted to kill Jackson by shooting at her with a .38 caliber handgun on January 22, 1999, with the intent of preventing her attendance and testimony at Randall's upcoming trial" on internet harassment and credit card fraud charges. *United States v. Cope*, 312 F.3d 757, 769 (6th Cir. 2002).

2

AUSA Bunning represented the government in pretrial proceedings involving the

Copes.  The Copes pled not guilty to all counts, and on February 3, 2000, the jury

convicted them on all counts save those related to the alleged conspiracy to kill

AUSA Bunning.

In an opinion affirming the Copes' convictions, the Sixth Circuit set forth a

detailed account of the background facts of this case, including the attempted

murder of Sarah Jackson.  *United States v. Cope*, 312 F.3d 757, 769 (6th Cir.

2002).  As a portion of this factual summary states:

> On January 22, 1999, ten days before Jackson was scheduled
> to testify against Randall regarding the internet harassment and credit
> card fraud charges, someone fired gunshots at the car in which
> Jackson and her son were sitting as they were about to pull out of
> their home's garage in Florence, Kentucky.  Five bullets, which were
> fired from a .38 caliber revolver, penetrated Jackson's car.  The rifling
> characteristics showed that the bullets could have been fired from one
> of three .38 caliber revolvers later found at the home of the Copes'
> father or from the .38 caliber revolver discovered four months later in
> the yard of Terry's house.  But the bullets could have been fired from
> any of 50 to 100 million other handguns with the same rifling
> characteristics.
>
> Jackson did not see who fired the shots.  She believed,
> however, that Randall played a role in the shooting due to the
> tumultuous nature of their relationship, the fact that Jackson had
> testified at Randall's detention hearing and was scheduled to testify at
> his trial, and Randall's having confided in her that he wished to have
> his ex-wife, Sandy, who currently resides in Denver, Colorado, killed
> with an unregistered gun.
>
> Randall talked to two other fellow inmates, James Hiatt and Carl
> Clay, about his desire to have Jackson killed.  The day after the
> shooting, Randall told Clay that "if something happened to him
> (Randall), . . .someone in his family would kill her."  After Randall
> talked with Hiatt about having Jackson killed, Hiatt contacted a

3

Federal Bureau of Investigation agent, who told Hiatt to give Randall the name "Bill" if Randall approached him again about killing Jackson. The agent also supplied Hiatt with the phone number of Bill, who was in actuality an undercover sergeant with the Campbell County Police Department.

Randall subsequently asked Hiatt if Bill would "take care of somebody for him." When Hiatt replied that it would be possible, Randall wrote to Terry: "I found someone who can handle all our jobs. He . . . will do whatever needs to be done. He typically works locally here, but is willing to travel out of town to do special jobs assuming the money is right. Bill @ 341-5125. Supposedly very reasonable, quiet (no issues), and able to do anything." He later wrote to Terry: "[Bill] recently did a job for a guy I met. In less than a week, he produced the desired results. And all the guys [sic] problems were eliminated permanently . . . . He has access to dynamite, blasting caps & fuses . . . ."

Randall wrote [several] other incriminating letters. The first, written on February 12, 1999, was addressed to his parents, apprising them that five "warning shots" had been fired into Jackson's car from a distance of three to five feet. . . . Randall subsequently wrote a letter dated March 21, 1999 to Terry to tell him that Jackson would likely testify against Randall regarding the internet harassment and credit card fraud charges because she was "fully committed to trying to get me sent to prison." He also told Terry to contact the "drywall contractor" and to "handle business" for him, meaning that Terry was to find a contract killer to murder Jackson. . . .

[On April 6, 1999,] Terry, who had previously arranged a meeting with "Bill," met Bill in Florence, Kentucky. Terry instructed Bill to kill Jackson, and he provided Bill with Jackson's full name and address. He also told Bill that Jackson's car already had bullet holes in it and laughed that Jackson was "gun shy." Bill agreed to kill Jackson for $5,000, half of which he requested immediately. Terry then gave Bill an envelope containing $2,500. . . .

Law enforcement officers arrested Terry at the end of his conversation with Bill. While interrogating Terry, the officers requested Terry's permission to search his truck. Terry acquiesced and accompanied them to the truck, where the officers found another envelope containing approximately $2,500, as well as several of

4

Randall's incriminating letters . . . .

*Cope*, 312 F.3d at 765-67.

On November 1, 2004, the defendant filed the motions presently before the court, seeking both to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 and a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  In keeping with local practice, this matter was referred to a magistrate judge for a report and recommendation.  On September 14, 2005, the magistrate judge issued his report, in which he recommended that the motion for a new trial (DE 242) be denied in its entirety, and that the motion to vacate the conviction and sentence (DE 241) be denied on all but four claims.  (DE 291 at 56-57.) The magistrate judge also recommended "that an evidentiary hearing be held as soon as practicable in order to determine the propriety of relief under 28 U.S.C. § 2255" for each of these four remaining claims.  *Id.* at 57.

On April 4, 2006, the court adopted the magistrate judge's report and recommendation as its opinion and ordered an evidentiary hearing to address the four remaining issues: first, Terry's claim that his trial counsel "failed to interview" a potential alibi witness, "despite being told by the defendant to do so"; second, Terry's general claim that his "trial counsel failed to prepare or present an alibi defense"; third, Terry's claim that his trial counsel failed to investigate or present relevant alibi evidence concerning the condition of a van; and fourth, Terry's claim that his "trial counsel admitted defendant's guilt during closing argument without

5

the defendant's prior knowledge or consent."   (DE 313 at 2.)

A hearing on these four issues was held in May 2006.[2]   At the conclusion of this hearing, the court ordered both parties to file proposed findings of fact and conclusions of law.  *See* DE 321, 324, 326.  Having reviewed the proposed findings of fact and conclusions of law, the court will now address the remaining issues.

---

[2]  During this hearing, Terry renewed his objection to the participation of the U.S. Attorney's office in Covington, but he did not provide any further argument on this issue.  *See* DE 318 at 83.  Accordingly, the court will not consider this objection at any greater length.

Terry has also renewed his request to conduct certain ballistics tests on the guns and bullets introduced into evidence.  *See, e.g.*, DE 317 at 5; *see also* DE 321 at 25.  The magistrate judge addressed this issue in his report and recommendation, which this court has adopted.  In his report and recommendation, the magistrate judge concluded that Terry's "vague and conclusory arguments" about this ballistics testing issue were "wholly insufficient to support relief under Rule 33."  (DE 291 at 14.)  Accordingly, the court will not consider this objection at any greater length.

In his proposed findings of fact and conclusions of law, Terry also briefly raises his trial counsel's alleged error in advising him not to testify in his own defense.  (DE 321 at 24.)  This argument was addressed and rejected in the magistrate judge's report and recommendation, *see* DE 291 at 30-33, which the court has adopted.  More specifically, the magistrate judge referred to this court's "careful[] questioning" of Terry at his trial.  DE 291 at 31.  During his exchange with this court at his trial, Terry indicated that he was certain that he did not want to testify, and he claimed that this decision was wholly voluntary.  *See id.* at 31-32 (quoting DE 201 at 122-23).  In addition, Terry's testimony on this issue at the May 2006 hearing was directly contradicted by the testimony of his trial counsel.  The court finds that Terry's trial counsel's testimony was credible on this issue, and insofar as Terry's trial counsel's testimony contradicts Terry's own testimony in May 2006, the court finds that Terry was not credible.

Finally, in his proposed findings of fact and conclusions of law, Terry also briefly discusses his trial counsel's alleged error in failing to obtain a pretrial deposition from his mother.  (DE 321 at 24-25.)  This argument was also addressed and rejected in the magistrate judge's report and recommendation, *see* DE 291 at 28-29, which the court has adopted.

6

**II.    ANALYSIS**

The remaining claims for relief revolve around Terry's general assertion that his trial counsel's performance "fell below prevailing professional norms and severely prejudiced" his defense.  (DE 241 at 39.)  Under the standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a convicted defendant who raises ineffective-assistance-of-counsel claims must satisfy a two-part test.  To begin, "the defendant must show that counsel's performance was deficient" by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 468 U.S. at 687.  In addition, the defendant must also show "that the deficient performance prejudiced the defense" – in other words, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*  When reviewing the performance of trial counsel, the court must employ a "highly deferential" standard and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."  *Id.* at 689.

**A.    Trial Counsel's Alleged Alibi-Related Errors**

Most of Terry's remaining claims are related to an alleged alibi, part of which was not presented at Terry's trial.  This alleged alibi argument relies heavily on the testimony of Julia Woods, who was Terry's fiancée at all relevant times until immediately after his arrest in April 1999.  In order to place this alleged alibi in

context, "[t]he evidence at trial was that the Jackson shooting occurred at approximately 6:30 to 6:40 a.m. E.S.T. in Florence, Kentucky," on January 22, 1999, and that Terry "was seen driving Ms. Woods['s] green van in Hendersonville, Tennessee approximately four hours later at 9:40 a.m. C.[]S.T." (DE 291 at 40.) Terry claims that his trial counsel rendered constitutionally ineffective assistance by failing to adequately investigate the alleged alibi, which is summarized immediately below.

At the May 2006 hearing before this court, Woods testified that she lived in Hendersonville, Tennessee, in 1999. She also testified that Terry was at her house in Hendersonville on January 21, 1999, until sometime between 9:30 and 10:00 in the evening, when he drove her van back to his house in Hendersonville. (DE 317 at 12-15.) Woods then testified that she called Terry later that evening and urged him to drive to Jackson, Tennessee, in order to check on potential storm damage on some property he owned. *Id.* at 15-16. Woods then testified that she saw Terry again at about 8:00 in the morning on January 22, 1999, when he arrived at her house in Hendersonville and took her to work. *Id.* at 16-17. Woods also testified that her van had problems with its "serpentine belt," which Terry had attempted to repair with only partial success. *Id.* at 15. In an affidavit filed on October 24, 2004, Woods stated that Terry could not have shot at Sarah Jackson and her son in Florence, Kentucky on the morning of January 22, 1999, because Woods's van was "mechanically incapable of making the trip from Hendersonville,

Tennessee to Northern Kentucky and return in the time frame asserted at Mr.
Cope's trial."  (DE 291 at 12.)

In addition, Woods testified that although she spoke with Terry's trial
counsel shortly after Terry's arrest in April 1999, the conversation focused mostly
on whether she would put up her house as a bond for Terry, a request she declined.
*See* DE 317 at 35-36, 17.  More specifically, Woods testified that she did not recall
discussing Sarah Jackson's shooting or the events of January 21-22 with Terry's
trial counsel.  *Id.* at 35-36.  Woods testified that she never spoke with Terry's trial
counsel, or anyone representing Terry's trial counsel, after that initial conversation.
*Id.* at 17.  None of this testimony from Woods was presented at Terry's trial, but at
the May 2006 hearing, Woods testified that she would have been willing to provide
all of this testimony at Terry's trial in 2000 if she had been called to do so.  *Id.* at
17-18.

At the May 2006 hearing, Terry also provided testimony about the events of
January 21-22, 1999.  According to Terry, he left Woods's house in Hendersonville
between 9:30 and 10:00 in the evening in her van.  Later that night, he spoke with
her twice on the telephone, and she encouraged him to go check his property in
Jackson, Tennessee, for tornado damage.[3]  (DE 317 at 73.)  Terry then testified
that after Woods's second telephone call, he drove from his house in

---

[3] Unlike Woods's testimony, Terry's alleged trip to Jackson was known to
Terry's trial counsel, who attempted to elicit testimony about this alleged trip
during the trial from Terry's housekeeper.

Hendersonville to Jackson – a one-way distance of "[a]pproximately 152 miles" –
to check on his property in the middle of the night.[4]  *Id.* at 74, 84.  Terry testified
that he took Woods's van instead of one of his other vehicles because the van was
already "warmed up[,]" and because he erroneously believed that he had "repaired
the van completely" before he left for Jackson.  *Id.*  Soon after he left for Jackson,
however, Terry testified that he realized that the van's serpentine belt was not
completely repaired, and therefore he testified that he "couldn't go above [60 miles
per hour] or elected not to, because I didn't want to throw the belt."  *Id.* at 85.

     Terry then testified that after driving through the night to Jackson, he briefly
surveyed his property, determined that the tornadoes had caused only minimal
storm damage, and then immediately returned to Hendersonville, arriving back at
Woods's house "sometime between 8:00 and 8:30" on the morning of January 22,
1999, when he drove her to work.[5]  *Id.* at 75.  Finally, Terry testified that although
he told his trial counsel about this alibi "at least a dozen times[,]" his trial counsel
never conducted any investigation and never raised the issue at his trial.  *Id.* at 76.

     In general, Terry claims that his trial counsel's failure to prepare, present, or
argue an alibi defense for the attempted murder of Sarah Jackson constituted

---

     [4]  More specifically, Terry claims that he left Hendersonville for Jackson
between 1:00 and 2:00 in the morning of January 22, 1999.  (DE 317 at 85.)

     [5]  Terry concludes, and the government does not seriously dispute, that this
alleged excursion from Hendersonville to Jackson and back would have left Terry
with no time to drive to Florence, Kentucky, to shoot at Sarah Jackson and her son
at 6:30 in the morning of January 22, 1999.

ineffective assistance of counsel.  In addition to this general claim, Terry raises two more specific claims of error.  Because Terry presented "preliminary factual disputes sufficient to warrant an evidentiary hearing[,]" this court adopted the magistrate judge's recommendation and held an evidentiary hearing to review these specific claims: first, Terry's claim "that he was denied the effective assistance of counsel due to his attorney's failure to investigate the condition of the van"; and second, Terry's claim that he was denied the effective assistance of counsel due to his attorney's failure "to investigate and call [Julia] Woods to support his alibi defense."  (DE 291 at 47-48.)

These claims do not require any "special amplification" of the general *Strickland* standard "in order to define counsel's duty to investigate, the duty at issue in this case."  *Strickland*, 466 U.S. at 690.  More specifically, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.* at 690-91.  Moreover, "counsel has a duty to make a reasonable decision that makes particular investigations unnecessary."  *Id.* at 691.  In this case, as in any other ineffectiveness case, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.*  With this standard in mind, the court will

11

now review Terry's specific alibi arguments.

### 1.   The Alleged Woods Alibi

First, the court will address the alleged failure of Terry's trial counsel to sufficiently investigate Woods's alleged alibi.  Terry claims that on April 7, 1999 – the day he was arrested – he gave the name, address, and telephone number of his "girlfriend/fiancee, Julia Woods," to his trial counsel, with instructions to contact Woods "because she was a 'critical witness' . . . ."  (DE 321 at 1.)   Terry recognizes that his trial counsel called Woods the next day and spoke with her for "10.6 minutes[,]" but aside from this initial phone call, he claims that his trial counsel "did not communicate with Ms. Woods again."  *Id.* at 2.  Regardless of whether his trial counsel actually spoke with Woods about the attempted murder of Sarah Jackson during this single conversation, Terry argues that his trial counsel's failure to conduct further interviews with Woods was "unacceptable."  (DE 318 at 26.)

At the May 2006 hearing, Terry's trial counsel acknowledged that he had interviewed Woods only once, immediately after Terry's arrest.  *See, e.g.*, DE 317 at 151-52.  But Terry's trial counsel also testified that he made sure Woods knew about the January shooting incident involving Sarah Jackson.  *Id.* at 152.  He also testified that "it was clear" to Woods that he was asking for help with the merits of the case against Terry because he expressly asked Woods if "she would be able to testify for Terry regarding that or the other event of this murder for hire."  *Id.* at

12

152. According to Terry's trial counsel, despite these questions, and despite his belief that Woods wanted to help Terry, Woods failed to provide him with any information whatsoever about Terry's whereabouts on January 22, 1999.[6] *Id.* at 155. Terry also testified that he felt the results of his conversation with Woods were confirmed when the prosecutors provided him with the results of their own subsequent interview with Woods, in which she "informed them that she was not going to be an alibi witness for Terry that morning either."[7] *Id.* at 134. Finally,

---

[6] More specifically, Terry's trial counsel provided the following summary of his conversation with Woods during his testimony at the May 2006 hearing:

> [H]ere are the issues that are out here . . . . One of them being the situation in Tennessee, and one of them being the January shooting [the Sarah Jackson shooting], as well as this murder for hire situation. Do you know anything about these things? If you do, can you help us with, you know, this information? Do you know anything about this shooting? If you do, is there anything you can help us with? . . . . Her answer was no, that she was aware of the Tennessee, and she was aware of the situation in January [the Sarah Jackson shooting], but there was – she was not in a position to help me or help Terry in being able to provide any information to his defense in that regard.

(DE 317 at 131-32.)

[7] More specifically, even at the May 2006 hearing, Woods admitted that in May 1999, she told prosecution investigators that she went to work and returned home from work on January 22, 1999, without seeing *or even hearing from* Terry. (DE 317 at 22-25.)

At the May 2006 hearing, Woods acknowledged that her prior statements were at odds with her current testimony. She blamed the discrepancy on a faulty memory, which, according to her testimony, *was not accurately refreshed until 2004 – five years after* she told both prosecution investigators and, allegedly, Terry's trial counsel, that she could not provide an alibi for Terry and *could not even recall seeing him or hearing from him on that date*. To explain this puzzling discrepancy in her memory, Woods testified that she simply had not reviewed the "notes and records that [she] had kept" of that time period until 2004. (DE 317 at

13

Terry's trial counsel testified that Terry never said that Woods could provide an alibi – in fact, according to Terry's trial counsel, Terry specifically stated that he had no alibi witnesses.[8]  *Id.* at 104.

The court finds that Terry's trial counsel's testimony was credible on this issue, and insofar as his testimony contradicts Woods's testimony and Terry's testimony, the court finds that their testimony was not credible.  Beyond the testimony he and Woods provided at the May 2006 hearing, Terry relies on cases such as *Clinkscale v. Carter*, 375 F.3d 430 (6th Cir. 2004), and *Matthews v. Abramajtys*, 319 F.3d 780 (6th Cir. 2003), to support his argument.  But based on its findings about the relative credibility of Woods, Terry, and Terry's trial counsel, the court finds that neither case bears any meaningful similarity to the vigorous

---

25.)

    [8]  More specifically, Terry's trial counsel testified at the May 2006 hearing that he was "absolutely clear" that Terry never told him that Woods could provide an alibi because he had

> reviewed all of my notes on whether he [Terry] ever told me to get ahold of [Woods] again because she could be an alibi.  There are none.  There is nothing in my file that would indicate that [Woods] was going to be an alibi witness in this matter.  I mean, I went through – I chased everything.  I subpoenaed the copy repairman in [the prosecutor's office] the morning that Terry was there.  I, you know, we looked at traffic reports.  We tried to get weather reports.  We chased every lead we could find on where Terry's whereabouts were.  We looked to see if there would have been . . . credit card receipts from gas stations, tickets, that would demonstrate where he was.  I mean, we looked at everything.

(DE 317 at 105.)

defense presented by Terry's trial counsel in the case at hand.[9]

As the government concedes, the failure to discover and present evidence of a credible alibi witness may well constitute ineffective assistance of counsel under the *Strickland* test.  *See, e.g.*, *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (stating that counsel's failure to "make any attempt to investigate this known lead" and to "make a reasoned judgment that for some reason investigation was not necessary" constituted ineffective assistance of counsel under *Strickland*). This case, however, does not involve such a failure: there was no "known lead" in this case; rather, Terry relies on an alleged alibi that did not fully emerge until Woods's memory improved *five years after* the events in question occurred.

In this case, trial counsel faced several charges supported by evidence that, in the view of this court, was frankly "overwhelming."  (DE 291 at 49.) Immediately after Terry's arrest, Terry's trial counsel contacted Woods, outlined the pending charges and investigations, and asked Woods whether she could provide any testimony for his client.  She declined.  Terry's trial counsel then learned from

_____

[9] For example, unlike Terry, the defendant-petitioner in *Clinkscale* "immediately informed" his appointed trial attorneys "of his alibi and the individuals who could corroborate it."  375 F.3d at 434.  An investigator then corroborated the *Clinkscale* defendant's claimed alibi, and his attorneys simply failed to file the notice of alibi with the court in a timely fashion.  *Id.*  Accordingly, the Sixth Circuit held that the attorneys' failure to present an alibi argument was objectively unreasonable.

*Matthews* is similarly inapposite.  In *Matthews*, the defendant-petitioner's trial counsel initially declined to put on any defense whatsoever.  319 F.3d at 785. After prompting from the trial court, trial counsel in *Matthews* simply recalled three government witnesses, and then presented a "rambling closing argument in favor of reasonable doubt . . . ."  *Id.* at 786.

15

the prosecution that their own interviews with Woods confirmed the results of his initial conversation.  Finally, Terry himself informed his trial counsel that he lacked alibi witnesses.

In light of these facts, Terry's trial counsel exercised reasonable professional judgment in limiting his investigation into alibi witnesses generally, and Woods specifically, in favor of searching for alibi evidence such as telephone records and credit card receipts.  *See Strickland*, 466 U.S. at 690-91 (stating that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").  Therefore, the court finds that this ineffective-assistance-of-counsel claim fails to satisfy the first prong of the *Strickland* test.[10]

### 2.    The Alleged Condition of Woods's Van

Next, the court will address the alleged failure of Terry's trial counsel to investigate or present evidence concerning the alleged mechanical problems with Woods's van.  It bears repeating that although the testimony Woods provided in May 2006 was not presented at Terry's trial, evidence *was* presented at the trial

---

[10]   Accordingly, the court need not reach the second prong of the *Strickland* test.  Nevertheless, the court observes that even if Terry could show that his trial counsel's investigation of this issue had been objectively unreasonable, the frankly incredible alleged alibi outlined by Terry's testimony and Woods's testimony at the May 2006 hearing would not provide any reason to doubt the reliability of the verdict in this case.  *See, e.g.*, *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (citing, inter alia, *Lockhart v. Fretwell*, 506 U.S. 364, 368-71 (1993), and stating that "[t]he question for reviewing courts" in analyzing claims under *Strickland* is whether demonstrable errors of counsel "have likely undermined the reliability of, and confidence in, the result").

16

that Terry was seen driving Woods's van in Hendersonville, Tennessee approximately four hours after the attempted murder of Sarah Jackson in Florence, Kentucky.  (DE 291 at 40-41.)  Moreover, the government presented evidence at trial that Terry was a particularly fast and reckless driver, and that the normal traveling time between Hendersonville and Florence was approximately four hours, giving Terry ample time to shoot at Sarah Jackson in Florence and return to Hendersonville in time to be seen at around 9:40.  *Id.*  No evidence about the condition of the van was presented at trial.

As discussed above, in May 2006 Terry testified that while he was driving Woods's van on January 22, 1999, "[a]ny time the speed limit was over 60, I couldn't go above it or elected not to, because I didn't want to throw the belt." (DE 317 at 85.)  Terry also presented evidence at the May 2006 hearing that the drive from Florence to Hendersonville actually takes four hours *and twenty-three minutes*, provided that one is driving a van which, due to mechanical problems, cannot be driven faster than 60 miles per hour.  (DE 317 at 53.)  Based on this evidence, Terry now suggests that even if he had not driven to Jackson, Tennessee, the alleged mechanical problems with Woods's van would have prevented him from returning to Hendersonville from Florence within four hours of the attempted murder of Sarah Jackson.

To support his ineffective-assistance-of-counsel argument, Terry also claims that he told his trial counsel about the alleged problems with Woods's van several

17

times.  Despite his best efforts, Terry claims, his trial counsel failed to investigate this issue or raise it at trial.  Terry argues that if his trial counsel had investigated the mechanical condition of the van and presented evidence of the mechanical condition of the van at trial, then Terry's trial counsel could have presented the jury with an alibi for the Sarah Jackson shooting – an alibi independent from both Woods's testimony and Terry's alleged trip to Jackson, Tennessee.  Terry concludes that his trial counsel's failure to investigate this potential alibi evidence constituted ineffective assistance of counsel.

Contrary to Terry's own testimony, Terry's trial counsel testified that Terry never spoke with him about the condition of the van.[11]  The court finds that Terry's trial counsel's testimony was credible on this issue, and insofar as his testimony contradicts Terry's testimony, the court finds that Terry's testimony was not credible.  "A trial counsel cannot be ineffective for failing to raise claims as to which his client has neglected to supply the essential underlying facts when those facts are within the client's possession; clairvoyance is not required of effective trial counsel."  *Dooley v. Petsock*, 816 F.2d 885, 890-91 (3d Cir. 1987) (citing *Jackson v. Scully*, 781 F.2d 291 (2d Cir. 1986)); *see also United States v. Avery*, 15 F.3d 816, 817-18 (9th Cir. 1994) (holding that trial counsel was not

---

[11]  More specifically, Terry's trial counsel testified that the only conversation he had with Terry related to the van was about "the number of green minivans that there could be . . . . But as far as saying this van could not travel, and you need to go get it checked out, that was never a part of our conversation."  (DE 317 at 106.)

constitutionally ineffective for failing to present certain information that the defendant did not disclose).  Therefore, the court finds that Terry has failed to show his trial counsel was constitutionally ineffective for failing to raise the alleged condition of Woods's van at trial.

**B.     Trial Counsel's Admission of Guilt During Closing**

Finally, the court will address Terry's claim that his trial counsel's admission of guilt was made without his prior knowledge or permission, and thereby constituted ineffective assistance of counsel.  During his closing argument, Terry's trial counsel admitted that when Terry met with "Bill" on April 6, 1999, immediately before his arrest, he did so with the purpose of paying "Bill" to have Sarah Jackson killed.  (DE 291 at 48.)  Immediately after this concession, however, Terry's trial counsel insisted that reasonable doubt existed for the remainder of the charges against Terry.  *Id.*  "Despite serious reservations concerning whether the admission of guilt was either 'error' or prejudicial under *Strickland*," the magistrate judge recommended that the court "permit the defendant to present additional evidence concerning this issue at an evidentiary hearing."  *Id.* at 50.  In general, trial counsel cannot consent to a guilty plea on a client's behalf; however, trial counsel *may*, for strategic reasons, concede the guilt of his client on some or all charges without obtaining the affirmative and explicit acceptance of that strategy from his client.  *Florida v. Nixon*, 543 U.S. 175, 187-88 (2004).  The concession of guilt made in this case falls into the latter category.

19

At the May 2006 hearing, Terry testified that he did not know that his trial counsel was going to concede his guilt on the murder-for-hire charge.  (DE 317 at 77.)  He also testified that he would not have permitted his trial counsel to make this concession if he had known about it in advance.  *Id.*  In contrast, Terry's trial counsel testified that he and Terry did talk about his closing argument.  According to Terry's trial counsel, he told Terry that conceding guilt on the murder-for-hire charge was the "best strategy," and Terry agreed that his trial counsel should present such a concession during his closing argument.[12]  (DE 317 at 107-08.) The court finds that Terry's trial counsel's testimony was credible on this issue, and insofar as his testimony contradicts Terry's testimony, the court finds that Terry's testimony was not credible.

The court also finds that this "calculated gamble . . . was patently a reasonable strategy" in the face of overwhelming evidence.  *United States v. Gomes*, 177 F.3d 76, 83 (1st Cir. 1999).  "[B]y avoiding a hopeless claim of

---

[12]  More specifically, Terry's trial counsel testified that during "the last week of trial[,]" he and Terry had a conversation about his closing argument.  (DE 317 at 107.)  During this conversation, Terry's trial counsel told Terry that in order

> for me to have any credibility with the jury at all . . . that our best option at that point or best strategy was to admit to [the murder-for-hire] count being that they had the tape and evidence and people testifying, money exchange, and things of that nature, and then take on the jury with the ploy of that's proof beyond a reasonable doubt. And compare that with what they had on the other counts. . . . [And Terry] agreed with it.

*Id.* at 107-08.

innocence" on this charge, Terry's trial counsel attempted to "preserve[] some credibility with the jury for use where it might help." *Gomes*, 177 F.3d at 83. The results may not have been what he and his client hoped for, but they faced an exceptionally tough row to hoe, and trial counsel's choice of this tactic was neither objectively unreasonable nor prejudicial to his client's defense. *See id.* (citing, inter alia, *Jones v. Barnes*, 463 U.S. 745, 751 (1983), and holding that although a partial concession of guilt in the face of overwhelming evidence was "an uphill argument, . . . the tactic was certainly not incompetent representation"). Thus, the court finds that Terry's trial counsel made an objectively reasonable decision to concede his client's guilt on the murder-for-hire charge, and the court further finds that Terry expressly agreed with this decision. Therefore, the court finds that Terry has not shown that his trial counsel's closing argument constituted constitutionally ineffective assistance of counsel. Accordingly,

**IT IS ORDERED** that both the defendant's motion to vacate his sentence pursuant 28 U.S.C. § 2255 (DE 241), and the defendant's motion for a new trial and to vacate, set aside, and correct his sentence pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure (DE 242), are **DENIED**.

**IT IS FURTHER ORDERED** that the government's motion to strike the defendant's motion for pro se discovery (DE 306) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendant's pro se motion to take judicial notice of certain exhibits (DE 309) is **DENIED** and **STRICKEN** from the record.

**IT IS FURTHER ORDERED** that the defendant's motion for an extension of time to file a reply to the government's proposed findings of fact and conclusions of law (DE 325) is **GRANTED**.


Signed on February 7, 2007


*Jennifer B. Coffman*
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

22